88 Cal.App.3d 906 (1979)
152 Cal. Rptr. 130
In re W.O. et al., Minors.
THE PEOPLE, Plaintiff and Respondent,
v.
LAWRENCE O. et al., Defendants and Appellants.
Docket No. 44363.
Court of Appeals of California, First District, Division Three.
January 29, 1979.
*907 COUNSEL
Rose & Dettmer, Ronald W. Rose and Thomas H. Dettmer for Defendants and Appellants.
Evelle J. Younger and George Deukmejian, Attorneys General, Jack R. Winkler and Robert H. Philibosian, Chief Assistant Attorneys General, Edward P. O'Brien, Assistant Attorney General, William D. Stein, Herbert F. Wilkinson and Ina Levin Gyemant, Deputy Attorneys General, for Plaintiff and Respondent.
OPINION
HALVONIK, J.
The parents of two minor children appeal an order removing them from the home. The court below found that "the children are happy, content, clean, overall very well cared for, and that the parents are concerned parents." Nonetheless, because cocaine and marijuana were discovered at their residence, the court concluded that "having those drugs in the home leads to the possibility of harm or injury to these children ... [a] ... possibility in this case [that] might be remote ..." but a possibility sufficient to justify its order. We disagree and reverse.
*908 The beginning of appellants' problems can be traced to the period when the mother, pregnant with T.O., told her doctor that she had been ingesting heroin through her nose for the past few months. Although she was not addicted, her doctor, surprisingly, placed her on a methadone maintenance program. According to the meager record before us, she was treated with this highly addictive drug because of a heart condition. When T.O. was born four months later he exhibited symptoms of withdrawal and was referred to the juvenile probation department.
The reports of the counselor of the methadone program who visited the home daily before the birth and later reports compiled from the probation department's weekly visits revealed that T.O. and his two-year-old brother, W.O., were receiving excellent physical care in the home, that the home was well kept and adequately furnished, that both parents were deeply concerned about their children and that there was a warm and affectionate family relationship. The probation department recommended that T.O. be adjudged a dependent child and permitted to remain in the home. The recommendation was followed by the court which also ordered that the parents not use or possess narcotics, marijuana or dangerous drugs and required them to submit to searches and chemical testing.
On March 3, 1978, Maria Alvarez, a probation officer, accompanied by three policemen, made an unannounced visit to appellants' residence. Apparently this was a nighttime visit because the father and two children were sleeping; the mother opened the door. The family was confined to the living room while the officers searched the house. Within minutes, the mother suffered a convulsion, dropped T.O. and fell to the floor. The fire department was called, the mother was removed and the search continued. Cocaine was found in a metal strongbox on a closet shelf and marijuana was found in a box in a kitchen drawer. The parents were arrested and the children were taken to a shelter. Ms. Alvarez, in her report of the incident, said that the father told police officers that his wife had had a similar seizure the year before which was the product of a cocaine overdose and that his wife had taken cocaine the day before the search. The report, which was considered by the court below, concluded with the recommendation that the children be removed from the home.
In addition to the probation report, the court heard the testimony of several witnesses. All testified that from their observations the children appeared healthy, happy, well cared for and that the parents did not appear to be under the influence of drugs. Among these witnesses were *909 Maria Alvarez, the probation officer, Patricia Garvey, a public health nurse, and Elaine Shea, counselor at the children's shelter.
The father also testified. He said that during the period between the original court order and the search of his home he used cocaine in "minor" amounts. He had also used heroin but was using no drugs at the time of the hearing. He denied that his wife used cocaine or heroin in the months prior to the search and he denied that he had told anybody that she had or that he had told anybody that his wife had seizures as a side effect of cocaine use.
T.O. and W.O. came before the court in different circumstances. T.O. had been declared a dependent child shortly after his birth and the court was hearing a supplemental petition to remove him from his home pursuant to Welfare and Institutions Code section 387.[1] W.O. had not been declared a dependent of the court and the question was whether to grant a petition under section 300, subdivision (a) and then remove him from the home under sections 360 and 361. Because of these different circumstances, the trial court devoted a great deal of attention to the supposedly different standards applicable to the cases. All of this energy was misdirected. (1) In re B.G. (1974) 11 Cal.3d 679, 699 [114 Cal. Rptr. 444, 523 P.2d 244], "held section 4600 applied to all cases where custody of children was in issue, and it requires a finding by the court that placement away from the parent `... is essential to avert harm to the child....' (Italics added.)" (In re Carmaleta B. (1978) 21 Cal.3d 482, 495-496 [146 Cal. Rptr. 623, 574 P.2d 514]; and see In re T.M.R. (1974) 41 Cal. App.3d 694, 703-704 [116 Cal. Rptr. 292]; Wald, State Intervention on Behalf of "Neglected" Children; Standards of Removal of Children from Their Homes, Monitoring the Status of Children in Foster Care, and Termination of Parental Rights (1976) 28 Stan.L.Rev. 623, 643, 651-652.) Moreover, the finding must be supported by clear and convincing evidence. (In re Robert P. (1976) 61 Cal. App.3d 310, 317-318 [132 Cal. Rptr. 5].)
The record contains no evidence supporting the conclusion that parental custody would actually harm these children. The trial court's contrary conclusion was apparently motivated by three concerns: (1) the mother's seizure; (2) the parents' violation of a court's order that they not possess drugs; and (3) the possibility that one of the children might ingest a drug.
*910 (1) There is evidence that the mother had a seizure on the night the police searched her house and that she had a seizure in 1970. There is no medical evidence that her seizures were or could have been drug induced. Ms. Alvarez' probation report does contain the statement that the father opined that cocaine caused the mother's seizure but, at the hearing, he denied making that statement and his denial went unchallenged. There is, therefore, no competent evidence that the mother's incapacity was drug related. (See In re Eugene M. (1976) 55 Cal. App.3d 650, 658-659 [127 Cal. Rptr. 851].) Epileptics are not prohibited from raising their children; if the mother has a medical problem then it should be treated medically. Her seizures do not demonstrate that she is an unfit mother.
(2) Violations of court orders are not to be encouraged and violators may be appropriately punished. Taking away one's children is not an appropriate punishment. Punishing the parent distorts the focus of the custody inquiry; that focus must be exclusively on the question whether actual harm will come to the child.
(3) The trial court speculated that the drugs might have been accessible to the children and ingested by them. It is undisputed that the cocaine was located in a position beyond the reach of either of the children. The record does suggest that the marijuana was contained in a drawer which a two year old could reach. But there was no evidence that the two year old could open either the drawer or the box in which the marijuana was contained. Ideally, all substances unsuitable for children, be they illicit drugs or not, would be kept beyond their reach but a survey of substances kept under kitchen sinks would likely show a significant divergence between the ideal and the real. It would be better were there no illicit drugs present but "[a]lthough a home environment may appear deficient when measured by dominant socioeconomic standards, interposition by the powerful arm of the public authorities may lead to worse alternatives. A juvenile court may possess no magic wand to create a replacement for a home which falls short of ideal. California appellate decisions in wardship cases of the `dependent child' variety demonstrate rather extreme cases of neglect, cruelty or continuing exposure to immorality. [Fns. omitted.]" (In re Raya (1967) 255 Cal. App.2d 260, 265 [63 Cal. Rptr. 252].)
There is, as the court below found, a "remote possibility" that the children may be endangered by their present environment but remote possibilities do not provide grounds sufficient for removing a child from parental custody. "The right to the custody of one's own children, free *911 from unwarranted state interference, has long been recognized as a fundamental right." (In re Robert P., supra, 61 Cal. App.3d at pp. 319-320, fn. 9.) Fundamental rights do not fade before remote possibilities. Neither the order removing T.O. and W.O. from the home nor the order adjudging W.O. a dependent child is supported by the evidence.[2]
The judgment is reversed.
Feinberg, J., concurred.
SCOTT, Acting P.J.
I dissent. Our function is to determine if there was substantial evidence to support the trial court's finding. (People v. Jenkins (1970) 3 Cal. App.3d 529 [83 Cal. Rptr. 525]; In re Robert P. (1976) 61 Cal. App.3d 310 [132 Cal. Rptr. 5].)
To remove a child from the custody of its parents the court must make a finding of parental unfitness, supported by evidence showing that parental custody would actually harm the child. (In re B.G. (1974) 11 Cal.3d 679 [114 Cal. Rptr. 444, 523 P.2d 244].) The termination of parental rights requires clear and convincing evidence to support the required finding of unfitness. (In re Robert P., supra; but see In re Christopher B. (1978) 82 Cal. App.3d 608 [147 Cal. Rptr. 390].)
With these rules to guide us, it is clear that there is ample evidence to support the trial court's action. The record reveals that the mother of the minors, W.O. and T.O., had been a heroin user while pregnant with T.O. It was during this pregnancy that she was placed on methadone. When T.O. was made a dependent child of the court, prior to these proceedings, the placement of the child in the home of the parents required that the parents not use or possess narcotics, marijuana or dangerous drugs, and required the parents to submit to search and seizure and to chemical testing.
The majority opinion details the circumstances of the unannounced visit in early March of 1978 and the discovery of marijuana and cocaine in the home. The possession of these drugs was in direct violation of the court's order placing the dependent child in the home of the parents. *912 There was ample evidence that both parents had been using drugs, contrary to the order of the court. At the time of the search, the mother had a seizure. According to her husband this seizure was similar to one that she had had a year before, which was the product of a cocaine overdose. The father told the investigating juvenile probation officer that the mother had used cocaine the day before the search. Although the father denied making this statement, the court was entitled to believe the statement of the probation officer and not the statement of the father. At the hearing, the father admitted to the use of cocaine during the probationary period, in violation of the court order. He further testified that after the search in the instant case, he started using heroin again. He also testified that he had used heroin prior to November 1977, the date of the original court order. From these facts it is abundantly clear that the mother and the father were continuing their use of all manner of drugs.
The trial court was obviously concerned, additionally, that the drugs in the home would be accessible to the children, who might ingest them. The majority suggests that the places where these drugs were found were such that they would be inaccessible to these minors of tender years. Common sense, however, suggests that when the parents were using the drugs, they would be withdrawn from their storage places and could well be placed in areas of the home very accessible to the children.
The majority opinion appears to hold that parents who use narcotics and dangerous drugs, and expose their infant children to that use, are not unfit. I do not think that this is the law, nor should it be the law. Child abuse takes many forms. Exposing children to a life of drug use is one of those forms of child abuse. Our solicitude should be for the children, not the parents.
I would affirm the judgment.
A petition for a rehearing was denied February 28, 1979. Scott, Acting P.J., was of the opinion that the petition should be granted. Respondent's petition for a hearing by the Supreme Court was denied March 29, 1979.
NOTES
[1] All statutory references are to the Welfare and Institutions Code.
[2] According to In re Christopher B. (1978) 82 Cal. App.3d 608, 617 [147 Cal. Rptr. 390] a simple preponderance of the evidence, rather than the clear and convincing standard, suffices where mere dependence is the issue. But regardless of the test to be applied by the trial court, we cannot sustain its judgment absent substantial evidence.