[No. A116590. First Dist., Div. One. Apr. 10, 2008.]

ERIKA K., Plaintiff and Appellant, v.
BRETT D., Defendant;
NICOLE Q., Intervener and Respondent.

1260

**COUNSEL**

Deborah Dentler, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Amy Z. Tobin, under appointment by the Court of Appeal, for Intervener and Respondent.

Caroline J. Todd, under appointment by the Court of Appeal, for Minor.

**OPINION**

**MARGULIES, J.**—Erika K. (Mother) is a member of a federally recognized Indian tribe. Due to financial difficulties, Mother left her daughter, Cecelia, in the care of a friend, Nicole Q., and moved away. Nicole thereafter assumed responsibility for Cecelia's parenting and financial support. Four years later, Mother asked that her daughter be returned to her. When both Cecelia and Nicole resisted, Mother filed a petition for child custody. Nicole responded by joining as a party and seeking custody of Cecelia herself, but she did not petition separately to be appointed Cecelia's guardian. Following an evidentiary hearing, the family court awarded custody of Cecelia to Nicole. While acknowledging that the Indian Child Welfare Act of 1978 (ICWA) (25 U.S.C. § 1901 et seq.) applied to the proceedings, the family court made no findings under the ICWA because it concluded that Cecelia's constitutional right to a stable home was paramount.

Mother contends that Nicole lacked standing to join as a party under the Family Code, that the court was precluded from awarding custody of Cecelia to a nonparent who had not been appointed Cecelia's guardian, and that the family court erred in finding the ICWA unconstitutional as applied to Cecelia. We find no error in the family court's application of the Family Code's custody provisions, but we agree that the court erred in concluding that the ICWA was unconstitutional before applying its substantive provisions. The order awarding custody of Cecelia to Nicole is reversed, and the matter is remanded for the limited purpose of securing compliance with the ICWA.

## I. BACKGROUND

Mother has five children, two older than Cecelia and two younger. In 2001, just before Cecelia entered the second grade, financial difficulties caused Mother, then a single mother, to send Cecelia to live with Nicole, whom Mother characterized as Cecelia's godmother. Cecelia was already well acquainted with Nicole and often stayed with her on weekend visits. Initially, Cecelia resided with Nicole during the week and with Mother on weekends, but Cecelia's weekend visits declined in frequency after Mother lost her home a few months later. In November 2002, Mother moved away, initially within California and then to an Indian reservation in Montana. Cecelia remained behind with Nicole.

The arrangements for Cecelia's care and nurture were informal. Mother and Nicole considered Cecelia's residence with Nicole to be the result of a mutual agreement, and Nicole never petitioned to be appointed Cecelia's guardian. When asked why she had not sought guardianship, Nicole explained, "[I]t has been my goal to support both [Mother] and helping

[Cecelia] and to support [Cecelia], and it didn't seem to me that it would be supportive to try to take a legal—everything was voluntary—voluntary placement. [¶] . . . [¶] My role was to be—was to be there for [Cecelia] and [Mother] and to not try to cause any problem or anything."

From the time Cecelia came to live with Nicole, responsibility for raising Cecelia shifted to Nicole, who treated her like a daughter. Nicole initially supported Cecelia financially entirely from her own income, but this was eventually supplemented with modest child support payments from Cecelia's father, who had never been married to Mother and had played no role in Cecelia's life. Mother provided no financial support for Cecelia.

Cecelia was given her own room in Nicole's home and lived, from all reports, a happy and satisfying life, participating in team sports, playing in the school band, forming varied friendships, and keeping pets and a horse. Cecelia also formed a strong bond with Nicole's mother, whom she treated as a grandmother. Nicole's mother participated actively in Cecelia's care, taking her to appointments and activities, and attending school functions. Cecelia often stayed with Nicole's mother on weekends.

Although Mother played no part in raising Cecelia day to day, the two did not lose contact. Cecelia visited Mother during summers and some holidays, spending extended periods with her. Native American culture and religion are an important part of Mother's life, and both she and Cecelia participated in Native American cultural and religious activities with some frequency, both in Montana and California. Nonetheless, the pair's relationship does not appear to have been particularly close.

In the summer of 2005, Mother decided that it was time for Cecelia to resume living with her and her two younger children in Montana.[1] When Mother came to visit Cecelia in California, however, Cecelia refused to return with her, and Nicole was unwilling to force Cecelia to return against her will.

After the police refused to intercede, Mother filed a petition for custody of Cecelia. Mother filed her petition pro se under the docket number of a prior proceeding brought by the County of Humboldt against Mother and Cecelia's father to procure payment of child support. The only other party listed by Mother in her petition was Cecelia's father.

Nicole promptly petitioned to be joined as a party to Mother's proceeding. The family court thereafter denied Mother's request for temporary custody

---

[1] Of Mother's five children, the younger two live with her, and the older two live with other family members outside California and Montana.

and granted Nicole's petition to participate as a party. After the filing of Mother's custody petition, both Mother and Cecelia became enrolled members of the Wailaki Indian tribe, based on Mother's Native American heritage.

The court conducted an evidentiary hearing on Mother's petition in August 2006. After speaking with Cecelia in camera and taking testimony from Mother, Nicole, Nicole's mother, and a Native American tribal official, the court granted custody of Cecelia to Nicole. In a written order, the court found that Mother had "essentially abandoned" Cecelia and that "a parent-child bond has developed between Nicole and Cecelia." It concluded that breaking that bond would be detrimental to Cecelia and that vesting custody in Nicole would serve Cecelia's best interests because it would permit Cecelia to maintain the settled life she had established in Nicole's home. The court also noted, "The child has expressed her preference [to stay with Nicole] to the court, in camera, as well as to all who would listen. The court finds that the child is of sufficient age and judgment to not only state her preference, but to express in her way the serious emotional trauma she would suffer if she were removed from the only stable home she has ever known."

In considering Mother's argument that her petition was subject to the placement provisions of the ICWA, the family court held, "the [ICWA] does not prevail over the child's right to have a stable home and environment. . . . [¶] . . . [Cecelia] has a fundamental right to remain during her developing years in one stable and loving home. Based on this finding, the court believes the [ICWA] allows for continuance of the present placement."

## II. DISCUSSION

### A. *Joinder*

Mother first contends that the family court erred in permitting Nicole to join as a party to the proceeding because Nicole "had no right to custody." Specifically, Mother contends that Nicole lacked standing because the Family Code permits an award of custody to a third party only under certain circumstances that were not present here. Mother relies on a California Continuing Education of the Bar publication, which in turn cites to Family Code sections 3040–3041, 3100–3105, and 3120, to support her argument that third party custody may be granted only in the context of a dissolution, legal separation, nullity of a marriage, an action brought by a married parent for exclusive custody of a child, or certain other limited circumstances. (Cal. Child Custody Litigation and Practice (Cont.Ed.Bar 2007) § 13.2, p. 459.)

Contrary to the impression created by Mother's brief, there are no provisions in the Family Code that specifically limit the types of proceedings in

which third party custody may be granted. Instead, the provisions cited by the publication on which Mother relies are those that define the legal proceedings to which the Family Code's custody provisions *as a whole* are applicable. If, as Mother argues, this is not one of those proceedings, the family court would have been without power to hear Mother's petition, since her petition was brought under those same Family Code provisions.

■ We do not, however, accept Mother's argument. Although the custody provisions of the Family Code make no express reference to unmarried parents, the provisions have been applied to resolve custody disputes between unmarried as well as married parents. (E.g., *Niko v. Foreman* (2006) 144 Cal.App.4th 344, 348, 362–363 [50 Cal.Rptr.3d 398].) The only subdivision of Family Code section 3021 that could authorize a petition by an unmarried parent is subdivision (f), which applies the Family Code custody provisions to "[a] proceeding to determine physical or legal custody or visitation in an action pursuant to the Uniform Parentage Act [(Fam. Code, § 7600 et seq.)]." While Mother did not style her pro se petition as brought pursuant to the UPA (Uniform Parentage Act), a UPA petition is the procedural vehicle by which unmarried parents establish their rights vis-à-vis each other and their children.[2] We therefore conclude that it is appropriate to apply the custody provisions of the Family Code in this circumstance, which features an unmarried parent seeking exclusive custody of her child.

■ Regardless, Nicole was properly made a party to this child custody proceeding. Family Code section 3041, subdivision (c) expressly anticipates that child custody might be granted under the Family Code to "a [nonparent] who has assumed, on a day-to-day basis, the role of [a child's] parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time." This is a codification of the de facto parent doctrine, which grants standing to persons who, like Nicole, have come to function as parent to a child, even though not the child's natural parent. (*In re Kieshia E.* (1993) 6 Cal.4th 68, 70–71 [23 Cal.Rptr.2d 775, 859 P.2d 1290].) It would make no sense for the Family Code to permit such a person to be awarded custody, yet deny them standing to participate as a party in the custody proceeding itself.[3]

---

[2] Consistent with a UPA proceeding, Mother's petition joined Cecelia's father as a party, although his previous acknowledgement of parenthood made it unnecessary for Cecelia to seek a declaration of parentage.

[3] In fact, California Rules of Court, rule 5.154(b) now permits any person "who has or claims custody or physical control of any of the minor children subject to the action" to be joined as party to a custody action. At the time of this proceeding, that subdivision expressly applied only to a person "who has or claims custody or physical control of any of the minor children *of the marriage* . . ." and therefore did not expressly authorize joinder in a proceeding such as this, where the child's parents were not married. (Former rule 5.154(b), italics added.) We view its subsequent amendment as recognition that joinder in these circumstances has

B. *Third Party Custody*

Mother also argues that, for various reasons, the family court erred in granting custody to Nicole.

█ Mother first argues that custody cannot be granted to a nonparent who is not a relative of the child unless that nonparent seeks and is awarded guardianship of the child. Guardianship is governed by the Probate Code, which grants broad discretion to the trial court in appointing a guardian. (Prob. Code, §§ 1510, 1514, subd. (a).) Once such a petition is granted, the guardian stands in a fiduciary relationship to the ward (Prob. Code, § 2101) and is responsible for "the care, custody, and control of, and has charge of the education of" the ward. (*Id.*, § 2351, subd. (a).) "A guardian of the person of a minor stands in the place of a parent, whose duty it is to supply that watchfulness, care and discipline which are essential to the young." (*Guardianship of Howard* (1933) 218 Cal. 607, 610 [24 P.2d 486].)

█ Child custody is governed by the Family Code, which grants similar broad discretion to the trial court. The trial court may make a child custody order "that seems necessary or proper." (Fam. Code, § 3022.) Legal custody of a child grants the custodian "the right and the responsibility to make the decisions relating to the health, education, and welfare of a child." (Fam. Code, § 3003.) "The essence of custody is the companionship of the child and the right to make decisions regarding his care and control, education, health, and religion." (*Lerner v. Superior Court* (1952) 38 Cal.2d 676, 681 [242 P.2d 321].)

█ Although the Family Code provisions apply to disputes between or involving parents (Fam. Code, § 3021), they allow for an award of custody to others as well. The trial court is guided by a statutory ranking of placement preferences: custody by one or both parents is preferred, followed by "the person or persons in whose home the child has been living in a wholesome and stable environment," followed by "any other person or persons deemed by the court to be suitable . . . ." (*Id.*, § 3040, subd. (a).) In order to award custody to a nonparent over the objection of a parent, the court must find that granting custody to the parent would be "detrimental to the child" and that granting custody to the nonparent "is required to serve the best interest of the child." (*Id.*, § 3041, subd. (a).)

█ As suggested by the foregoing, the role and responsibilities of a guardian appointed under the Probate Code are essentially identical to those of a nonparent custodian selected under the Family Code. The connection is

always been necessary to satisfy the de facto parent doctrine and serve the purposes of Family Code section 3041, subdivision (c).

made explicit by Probate Code section 1514, subdivision (b), which states that when a court appoints a guardian of the person of a minor, it must be guided by Family Code sections 3020, 3040, and 3041—in other words, it must make the identical judgment required in appointing a nonparent custodian. (See, e.g., *Guardianship of Olivia J.* (2000) 84 Cal.App.4th 1146, 1153 [101 Cal.Rptr.2d 364].) Accordingly, a guardian and a nonparent child custodian under the Family Code have essentially identical rights with respect to the child.

We find no authority to support Mother's contention that nonparent custody cannot be granted to a nonrelative under the Family Code in the absence of a guardianship petition. There is no statutory requirement for such a petition. On the contrary, the provisions of the Family Code make no reference to guardianship or the Probate Code, yet they plainly permit an award of custody to a nonparent. (Fam. Code, §§ 3040, 3041.) The two systems, guardianship in the Probate Code and custody in the Family Code, are parallel and independent.

Mother points out that custody of a child has rarely been awarded to a nonparent outside the context of a guardianship petition. Assuming this is true, it does not mean that a guardianship petition is a necessary prerequisite for nonparent child custody. On the contrary, the explanation for the prevalence of guardianship petitions appears to be procedural. The custody provisions of the Family Code apply only in proceedings that are generally, if not invariably, initiated by the parents of a child. Further, they have been held not to provide an independent basis for subject matter jurisdiction. (*In re Marriage of Lewis & Goetz* (1988) 203 Cal.App.3d 514, 518–519 [250 Cal.Rptr. 30].) A nonparent seeking custody therefore lacks standing to initiate a custody proceeding under the Family Code. A guardianship petition under the Probate Code is the only judicial means for a nonparent to obtain custody when the parents have not themselves initiated a custody proceeding.

Mother also makes the broader argument that a nonparent can never be awarded custody of a child under the Family Code when "a parent such as [Mother] is available to assume custody of the child and actively seeks custody." This argument is contradicted by Family Code section 3041, which anticipates that custody can be awarded to a nonparent even over parental objection.[4] Further, Family Code section 3041, subdivision (c) states that

---

[4] There is also a long line of case law awarding custody in such circumstances when the nonparent proceeds under guardianship law, which requires application of the same standards for nonparent custody as the Family Code. (Prob. Code, § 1514, subd. (b); e.g., *Guardianship of Zachary H.* (1999) 73 Cal.App.4th 51, 61–65 [86 Cal.Rptr.2d 7]; *Guardianship of Jenna G.* (1998) 63 Cal.App.4th 387, 394 [74 Cal.Rptr.2d 47]; *Guardianship of Diana B.* (1994) 30 Cal.App.4th 1766, 1774–1777 [36 Cal.Rptr.2d 447].)

custody can be awarded to a third party even though the child's parents have not been found unfit, expressly contradicting Mother's argument that nonparent custody can never be awarded when an otherwise suitable parent is available and willing to accept custody.

■ Nor do we find any merit in Mother's argument that Family Code section 3041, subdivisions (a) and (c) are inapplicable to a child who originally came into the care of the nonparent as a result of a consensual arrangement. Section 3041 makes no such distinction, and we find no basis in policy to imply an exception for consensual foster care. ■ Regardless of the manner in which the child came into foster care, subdivision (c) authorizes a finding of detriment to the child from "the harm of removal from a stable placement of a child with a person who has assumed, on a day-to-day basis, the role of his or her parent, fulfilling both the child's physical needs and the child's psychological needs for care and affection, and who has assumed that role for a substantial period of time." We find no abuse of discretion in the family court's conclusion that the statutory requirements of detriment and best interest were satisfied in these circumstances. (See *Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255 [109 Cal.Rptr.2d 575, 27 P.3d 289].)

### C. *ICWA*

The family court assumed, as we do, that Mother's and Cecelia's enrollment in the Wailaki tribe was sufficient to make Cecelia an "Indian child" for purposes of the ICWA. (25 U.S.C. § 1903(4).) Mother contends that, as a result, the ICWA was applicable to these proceedings and that the family court's decision violated the ICWA.

■ Under California law implementing the ICWA at the time of this proceeding, special rules applied to a proceeding leading to the foster care placement of an Indian child. (Cal. Rules of Court, former rule 1439(j), (k).)[5] Because a " '[f]oster care placement' " was defined as "any temporary placement from which a child may not be removed by the parent or Indian custodian upon demand, including . . . the home of a guardian or conservator" (Cal. Rules of Court, former rule 1439(a)(9)), Cecelia's custody hearing

---

[5] The application of the ICWA in this action is governed by California Rules of Court, former rule 1439. The parties discuss application of ICWA under such statutory provisions as Family Code section 3041, subdivision (e) and Welfare and Institutions Code section 361.31. These provisions, however, were not enacted until September 30, 2006, two months *after* the family court awarded custody to Nicole. (Sen. Bill No. 678 (2005–2006 Reg. Sess.); Stats. 2006, ch. 838, §§ 2, 49.) In the absence of some indication that these provisions were intended to be retroactive, we review the family court's decision under the rules in effect at the time of the hearing. (*In re Marriage of Ostler & Smith* (1990) 223 Cal.App.3d 33, 44, fn. 9 [272 Cal.Rptr. 560].)

qualified as such a proceeding. Accordingly, the family court could not award custody to Nicole over Mother unless it found "by clear and convincing evidence that continued custody with the parent or Indian custodian is likely to cause the Indian child serious emotional or physical damage." (Cal. Rules of Court, former rule 1439(j).) Further, the finding of serious emotional or physical damage could not be made in the absence of "[t]estimony by a qualified expert witness." (Cal. Rules of Court, former rule 1439(j)(1).) In addition, Cecelia's custody was governed by a different set of placement preferences than Family Code section 3040. Under former rule 1439(k), the primary foster care preferences for an Indian child were a member of the child's "extended family" or a facility approved by the child's tribe. (Cal. Rules of Court, former rule 1439(k)(1).) The trial court was permitted to depart from these preferences only upon a finding of "good cause," including the request of the child or his or her parents and the emotional needs of the child "as established by a qualified expert witness." (Cal. Rules of Court, former rule 1439(k)(4).)

■■■ Mother first contends that the family court erred in refusing to grant her oral motion for judgment under Code of Civil Procedure section 631.8, made after the close of Nicole's case. Section 631.8 permits the making of a motion for judgment in a court trial after a party has completed "his presentation of evidence." Mother argues that Cecelia's residence with Nicole was a voluntary placement under title 25 United States Code section 1913(b) and that Nicole's presentation of evidence, which consisted of the testimony of Nicole and her mother, failed to demonstrate grounds for refusing to return Cecelia to Mother under section 1913(b).[6]

■■■ Code of Civil Procedure section 631.8 expressly grants a trial court discretion to "decline to render any judgment until the close of all the evidence." (E.g., *O'Mara v. State Bd. of Pharmacy* (1966) 246 Cal.App.2d 8, 12 [54 Cal.Rptr. 862].) As Cecelia argues, this language has been interpreted to grant the trial court absolute discretion to deny a section 631.8 motion, meaning that "a trial court is never required under any conceivable set of circumstances to grant a motion under section 631.8 of the Code of Civil Procedure . . . . [A] trial court may always deny such a motion regardless of the state of the evidence . . . ." (*Watt v. Kantel* (1970) 13 Cal.App.3d 249, 253–254 [91 Cal.Rptr. 449].) As a result, as a matter of law the trial court could not have erred in postponing its decision on Mother's motion until the close of the hearing.

---

[6] Title 25 United States Code section 1913(b) states: "Any parent or Indian custodian may withdraw consent to a foster care placement under State law at any time and, upon such withdrawal, the child shall be returned to the parent or Indian custodian."

■ Nor do we agree with Mother's underlying legal argument that she was entitled to the return of Cecelia under section 1913(b) of title 25 of the United States Code solely by virtue of her withdrawal of consent to the placement of Cecelia with Nicole. Section 1913 applies to an Indian parent's consent to foster care placement initiated by the state. It does not address the informal placement of a child, such as Mother's. Further, as discussed below, any revocation of consent to foster care can be overcome under the ICWA if the court finds that a return to the Indian parent would cause serious injury to the child.

■ Mother next argues that the family court erred in concluding that Cecelia's placement with Nicole was constitutionally insulated from the ICWA. We agree that the family court acted prematurely in finding the ICWA unconstitutional as applied to Cecelia's custody decision. Prudent judicial restraint requires courts to avoid the unnecessary decision of constitutional issues. (E.g., *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1357 [63 Cal.Rptr.3d 483, 163 P.3d 160].) ■ Without determining that the ICWA actually required Cecelia's return to Mother, the family court concluded that the ICWA could not constitutionally require such a return. Under the doctrine of judicial restraint, the family court should not have proceeded to consider the constitutional question unless it had first concluded, after applying the various substantive provisions of the ICWA, that a constitutional issue actually existed. Such restraint is particularly important in these circumstances because the constitutional right invoked by the court is by no means well established.[7] Accordingly, we must remand the matter to the family court for application of the substantive provisions of the ICWA. In doing so, we do not mean to suggest any view as to the proper outcome of this matter under the ICWA.

Nicole and Cecelia argue that the family court properly could have rejected application of the ICWA's placement preferences on the basis of its interview with Cecelia. (Cal. Rules of Court, former rule 1439(k); see, e.g., *Fresno County Dept. of Children & Family Services v. Superior Court* (2004) 122 Cal.App.4th 626, 646–647 [19 Cal.Rptr.3d 155] [discussing the ICWA's placement preferences].) The argument has two flaws. First, while the family court might have been able to make a supportable finding of "good cause" under former rule 1439(k), it did not actually make such a finding because it

---

[7] The family court's invocation of a child's "fundamental right" to "one stable and loving home" derives from *In re Bridget R.* (1996) 41 Cal.App.4th 1483 [49 Cal.Rptr.2d 507], which held that children have a fundamental interest in the continuity and stability of their home. (*Id.* at pp. 1506–1507.) Since this matter was decided, the Sixth Appellate District, in a carefully reasoned decision, has seriously challenged the constitutional analysis on which the family court relied. (*In re Vincent M.* (2007) 150 Cal.App.4th 1247, 1265–1267 [59 Cal.Rptr.3d 321].)

concluded that Cecelia's constitutional rights precluded application of the ICWA. We cannot affirm on the basis of a discretionary finding the family court never made.

Second, and more fundamental, the family court could not award custody to Nicole over Mother unless it found "by clear and convincing evidence" that custody with Mother was likely to cause Cecelia "serious emotional or physical damage," based on the testimony of "a qualified expert witness." (Cal. Rules of Court, former rule 1439(j)(1).) Although the family court did conclude that Cecelia would suffer "serious emotional trauma . . . if she were removed from the only stable home she has ever known," there is no indication that the finding was made under the "clear and convincing" standard of former rule 1439, and the finding would, in any event, have been made without the support of the requisite qualified expert witness, in violation of the rule.[8]

Cecelia's counsel discusses *In re Brandon M.* (1997) 54 Cal.App.4th 1387 [63 Cal.Rptr.2d 671] and the de facto parent doctrine. While we have no reason to disagree with *Brandon M.*'s conclusion that the ICWA does not preempt the de facto parent doctrine, that holding does not dictate how any particular custody decision must be made. Regardless of whether Nicole was a de facto parent—and no such finding was made—the family court was still required to apply the terms of the ICWA to resolve the issue of custody.

The order awarding custody of Cecelia to Nicole is reversed for the sole and limited purpose of enabling a remand to the family court for compliance with the substantive provisions of the ICWA. If, after an evidentiary hearing in accordance with the ICWA, the trial court determines, in the exercise of its discretion guided by the new statutory provisions now applicable to the ICWA proceedings in California (Stats. 2006, ch. 838), that Cecelia should be removed from Mother and that good cause exists to depart from the ICWA placement preferences, the court shall reinstate the previous custody order placing Cecelia with Nicole. If, on the other hand, the court determines that under the ICWA, Mother or an Indian custodian shall be awarded custody of Cecelia, the prior custody order shall not be reinstated, and the court shall address the constitutionality of ICWA in these circumstances.

---

[8] While Mother presented the testimony of a representative of an Indian tribe, there was no showing that the witness was "qualified to address the issue of whether continued custody by a parent or Indian custodian is likely to result in serious physical or emotional damage to the child," as required by California Rules of Court, former rule 1439(a)(10). Further, the substance of the expert's testimony was limited to describing the historical child-rearing practices of Mother's tribe. He was not familiar with Cecelia's individual circumstances and therefore could not have testified regarding the effect on Cecelia of removing her from Nicole's home.

## III.  DISPOSITION

The family court's order awarding custody of Cecelia to Nicole is reversed, and the matter is remanded for further proceedings consistent with this decision.

Stein, Acting P. J., and Swager, J., concurred.